IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

KAREN SUE SPERLING, an Individual,    )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        Case No.: 16-cv-101-JED-TLW
                                       )
CSAA FIRE & CASUALTY INSURANCE         )
COMPANY, a Foreign Insurance           )
Corporation,                           )
                                       )
            Defendant.                 )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Respectfully Submitted,

Gerard F. Pignato, OBA No. 11473
Erin J. Rooney, OBA No. 31207
PIGNATO, COOPER, KOLKER
  & ROBERSON, P.C.
Robinson Renaissance Building
119 North Robinson Avenue, 11th Floor
Oklahoma City, Oklahoma 73102
Telephone:    405-606-3333
Facsimile:    405-606-3334
Email:  Jerry@pclaw.org
        erin@pclaw.org
**ATTORNEYS FOR DEFENDANT, CSAA
FIRE & CASUALTY INSURANCE COMPANY**

DATED: APRIL 11, 2017

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF UNDISPUTED MATERIAL FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

APPLICABLE STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PROPOSITION I:  PLAINTIFF HAS BEEN FULLY COMPENSATED FOR HER CLAIMED LOSS, AND THEREFORE, HER BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

  A.   Plaintiff is not entitled to further benefits under Coverage A - Dwelling.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

  B.   Plaintiff is not entitled to further benefits under Coverage C - Personal Property.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

  C.   Plaintiff is not entitled to further benefits under Coverage D - Fair Rental Value.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

  D.   Plaintiff cannot recover for the claimed mold damage in this lawsuit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

  E.   Plaintiff is not entitled to recover attorney's fees as contractual damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

PROPOSITION II:  PLAINTIFF'S BAD FAITH CLAIM FAILS AS A MATTER OF LAW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

PROPOSITION III: CSAA'S ALLEGED MISCONDUCT DOES NOT WARRANT SUBMISSION OF PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES TO THE JURY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

### TABLE OF AUTHORITIES

**<u>Cases</u>**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bituminous Cas. Corp. v. Cowen Const., Inc.*,
   55 P.3d 1030 (Okla. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Celotex Corp. v. Catrett*,
   441 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cent. Mut. Ins. Co. v. White Stone Prop., Ltd.*,
   A-12-CA-275-SS, 2014 WL 1092121
      (W.D. Tex, Austin Div. Mar. 19, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 13

*Christian v. American Home Assur. Co.*,
   577 P.2d 899 (Okla. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*City Nat. Bank &Trust Co. v. Jackson Nat. Life Ins.*,
   804 P.2d 463 (Okla. Civ. App. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Colo. Cas. Ins. Co. v. Sammons*,
   157 P.3d 460 (Wy. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cooper v. National Union Fire Ins. Co. of Pittsburgh, PA*,
   921 P.2d 1297 (Okla. Civ. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Digital Design Grp. Inc. v. Info. Builders, Inc.*,
   24 P.3d 834 (Okla. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Duensing v. State Farm Fire & Casualty Company*,
   131 P.3d 127 (Okla Civ. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-22

*Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co.*,
   756 N.W.2d 461 (Wis. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*First Nat'l Bank of Az. v. Cities Serv. Co.*,
   391 U.S. 253 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Fitzhugh 25 Partners, L.P. v. Kiln Syn. KLN 501*,
   261 S.W.3d 861 (Tex. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Garnett v. Government Employees Ins. Co.*,
   186 P.3d 935 (Okla. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

ii

*Gilbert v. N. Carolina Farm Bureau Mut. Ins. Cos.*,
   574 S.E.2d 115 (N.C. App. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hall v. Globe Life & Acc. Ins. Co.*,
   968 P.2d 1263 (Okla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Higgins v. Ins. Co. of N. Am*,
   469 P.2d 766  (Or. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Knolls v. Aetna Cas. & Sur. Co*,
   378 F.Supp.392 (S.D. Iowa 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Koch v. Koch Indus. Inc.*,
   203 F.3d 1202 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lester v. Sparks*,
   583 P.2d 1097 (Okla. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Manis v Hartford Fire Ins. Co.*,
   681 P.2d 760 (Okla. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Mattioda v. White*,
   323 F.3d 1288 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*McCorkle v. Great Atlantic Ins. Co.*,
   637 P.2d 583 (Okla. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*McLaughlin v. National Benefit Life Ins. Co.*,
   772 P.2d 383 (Okla. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Nicolaou v. Vermont Mut. Ins. Co.*,
   931 A.2d 1265 (N.H. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Oulds v. Principal Mut. Life Ins. Co.*,
   6 F.3d 1431 (10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Peters v. American Life Ins. Co.*,
   77 P.3d 1090 (Okla. Civ. App. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Randall v. Gov't Emp. Ins. Co.*,
   CIV-09-166-M, 2010 WL 845937 (W.D. Okla. 2010) . . . . . . . . . . . . . . . . . . . . . . . . 19

*Roads West, Inc. v. Austin*,
   91 P.3d 81 (Okla. Civ. App. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17

*Spears v. Shelter Mut. Ins. Co.*
   73 P.3d 865 (Okla. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Truesdell v. State Farm Fire and Casualty Company*,
   960 F.Supp. 1511 (N.D. Okla. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Willis v. Midland Risk Insurance Co.*,
   42 F.3d 607 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

## Statues

23 O.S. § 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

23 O.S. § 96. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

36 O.S. § 3621. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## Other Authorities

FED. R. CIV. P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Local Rule 56.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OKLAHOMA UNIFORM JURY INSTRUCTION 22.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

OKLAHOMA UNIFORM JURY INSTRUCTION 23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56 and Local Rule 56.1, Defendant, CSAA Fire & Casualty

Insurance Company ("CSAA"), respectfully requests the Court enter summary judgment in its favor.

### INTRODUCTION

This lawsuit arises out of a property damage claim submitted to CSAA.  Plaintiff asserts that

in handling her claim, CSAA breached its contract with her and did so in bad faith.  However, the

undisputed material facts, set forth below, demonstrate that Plaintiff cannot maintain a valid claim

for breach of contract because she has been fully compensated for her claimed loss.  In fact, Plaintiff

has received benefits well beyond those contracted for.  The undisputed material facts set forth below

further demonstrate that Plaintiff cannot maintain valid claims for bad faith or punitive damages.

Rather, it is clear that these latter claims were asserted in hopes of artificially inflating the value of

this frivolous lawsuit.

### FACTUAL BACKGROUND

Plaintiff contends that the insured property, a rental property, sustained damage as a result

of vandalism on November 10, 2014.  Upon notice of Plaintiff's loss, CSAA promptly opened a

claim and began its investigation.  CSAA's investigation indicated that the property had been vacant

for more than 60 days, and therefore, coverage was not afforded under the policy.  Specifically, the

policy does not insure losses caused by:

> (6)     Vandalism and malicious mischief, theft or attempted theft,
> and any intentional and wrongful act committed in the course
> of the vandalism or malicious mischief, theft, or attempted
> theft, if the dwelling has been vacant for more than 60
> consecutive days immediately before the loss.  A dwelling
> being constructed is not considered vacant.

The policy also includes the following exclusion:

1

(A)     We do not insure for loss caused by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in sequence to the loss.  These exclusions apply whether or not the loss event results in wide-spread damage or affects a substantial area.

*                    *                    *

**Neglect.**

Neglect means your neglect to use all reasonable means to save and preserve property at and after the time of loss.

After receiving CSAA's coverage decision, Plaintiff submitted additional information that she believed demonstrated her rental property was not vacant.  Plaintiff presented the utility bills (gas and electric) that she was paying at the time of the alleged vandalism. Although Plaintiff admitted she was not renting her house at the time of the alleged vandalism, she argued that her rental property was under "construction."  More specifically, Plaintiff claimed she was repairing damage caused by an unrelated water loss.  Upon receipt of this supplemental information, CSAA reopened its file for further investigation.  To date, CSAA has tendered $62,821.36 in benefits to Plaintiff.  However, the information obtained during the course of this lawsuit has made it apparent that Plaintiff was not actually entitled to many of the payments made to her.

<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

1.      Plaintiff claims that on November 10, 2014, her rental property, located at 7101 S. 228th St. E. Ave, Broken Arrow, Oklahoma 74014, sustained damage as a result of vandalism.  (*See* Petition [Dkt. No. 2-2], ¶¶ 1-4.)

2.      At the time of the alleged vandalism, Plaintiff's rental property was insured under a AAA Oklahoma DP3 Rental Property Insurance Policy (the "Policy").  (*See* Certified CSAA Policy, DP3-002795271, **EXHIBIT 1**.)  The Policy provided the following coverages:

2

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Dwelling | Other Structures | Personal Property | Fair Rental Value | Personal Liability Each Occurrence | Medical Payments to Others |
| $240,369* | $24037 | $12,018 | $48,074 | $300,000 | $1,000 |

*Your Section I coverage limits may have been changed to reflect changes in construction costs & other matter affecting replacement costs.

(Certified CSAA Policy, DP3-002795271, Declarations Page, **EXHIBIT 1**.) The Policy also included

the Specified Additional Insurance Coverage A (125% Extended Replacement Cost) Endorsement.

(*See* Certified CSAA Policy, DP3-002795271, **EXHIBIT 1**.)

      3.     The Policy provides in pertinent part:

**SECTION I – PERILS INSURED AGAINST**

**A. Coverage A - Dwelling And Coverage B - Other Structures**

    **1.** We insure against risk of direct physical loss to property described in Coverages A and B.

    **2.** We do not insure, however, for loss:

        **a.** Excluded under Section I Exclusions;

        **b.** Involving collapse, except as provided in Other Coverage 7. Collapse; or

        **c.** Caused by:

            *       *       *

           **(6)** Vandalism and malicious mischief, theft or attempted theft, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, theft or attempted theft, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss.

> A dwelling being constructed is not considered vacant;
>
> \*       \*       \*

**SECTION I – EXCLUSIONS**

> **A.** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.
>
> \*       \*       \*

> **5. Neglect**
>
> Neglect means your neglect to use all reasonable means to save and preserve property at and after the time of a loss.

(Certified CSAA Policy, DP3-002795271, pp. 18, 19, 25, 26, **EXHIBIT 1**.)

4.      On or about December 22, 2014, Plaintiff notified CSAA of the claimed loss. (*See* Claim Note, December 22, 2014 at 10:20 A.M., **EXHIBIT 2**.)

5.      Upon receiving notice of Plaintiff's claim, CSAA promptly opened a file and assigned Jimmy McCoy ("McCoy") as the field adjuster. (*See* Claim Note, December 22, 2014, at 10:44 A.M., **EXHIBIT 2**.)

6.      On or about December 29, 2014, McCoy contacted Plaintiff to discuss her claim and to schedule a site inspection. (*See* Claim Note, December 29, 2014, at 3:50 P.M., **EXHIBIT 2**.) The site inspection was initially scheduled to take place on January 5, 2015. (*See* Claim Note, December 29, 2014, at 3:50 P.M., **EXHIBIT 2**.) However, at Plaintiff's request, the site inspection was rescheduled on multiple occasions. (*See* Claim Notes, dated January 5, 2015, at 1:24 P.M. - January 12, 2015, at 2:14 P.M., **EXHIBIT 2**.)

7.      On January 15, 2015, McCoy was allowed to inspect the property.  (*See* Claim Notes, January 23, 2014, **EXHIBIT 2**.)

8.      Based upon McCoy's inspection and information obtained during the investigation of one of Plaintiff's prior claims (filed in September 2014), CSAA concluded that Plaintiff's property had been vacant for more than 60 days.  Thus, the vacancy provision was applicable unless Plaintiff could show otherwise.  (*See* Claim Note, January 27, 2015, at 1:03 P.M., **EXHIBIT 2**.)

9.      Plaintiff was notified of CSAA's coverage decision both verbally and in writing. (*See* Claim Note, January 27, 2015, at 5:20 P.M., **EXHIBIT 2**; Correspondence to Plaintiff from CSAA, dated January 29, 2015, **EXHIBIT 3**.)

10.     Plaintiff was notified that if she believed any of the information CSAA relied upon was inaccurate or if she had additional information that CSAA should consider, she should provide the information to CSAA.  And, upon receipt of any additional information, CSAA would reopen its file for further investigation.  (*See* Correspondence to Plaintiff from CSAA, dated January 29, 2015, **EXHIBIT 3**.)

11.     Plaintiff then informed CSAA that she believed the premises was "reasonably occupied for repairs", (*See* Petition [Dkt. No. 2-2], ¶ 6), and provided documentation (paid utility bills) that she believed supported her position. (*See* Correspondence from Bufogle to Wier, dated June 12, 2015, **EXHIBIT 4**.)

12.     At Plaintiff's request, CSAA reopened its file to review the newly submitted information.  (*See* Claim Note, dated June 9, 2015, at 12:58 P.M., **EXHIBIT 2**.)

13.     On June 26, 2015, McCoy reinspected the property.  Plaintiff's contractor, Ismael Deligorio, was present at the inspection. After reviewing the claimed damage, McCoy determined

that Deligorio's estimate was excessive and included items that were not related to the purported vandalism. (*See* Claim Note, dated July 6, 2015, at 8:17 a.m., **EXHIBIT 2**.)

14.     McCoy concluded the covered damage would cost $47,622.36 to repair. (*See* Estimate, dated October 27, 2015, **EXHIBIT 5.**)

15.     Applying depreciation and Plaintiff's $500.00 deductible, (Certified CSAA Policy, DP3-002795271, Declarations Page, **EXHIBIT 2**), CSAA tendered an actual cash value ("ACV") payment of $38,425.15 to Plaintiff. (*See* Correspondence to Bufogle, dated October 29, 2015, and attached Drafts, **EXHIBIT 6**.)  Plaintiff was informed that if her repair costs exceeded the ACV payment, upon receipt of supporting documentation, she was entitled to recover the depreciation hold back, up to $8,697.21. (*See* Correspondence to Bufogle, dated October 29, 2015, **EXHIBIT 6**.)

16.     Prior to filing this lawsuit, Plaintiff had not presented any information demonstrating she had completed the repairs to the property. (*See* Plaintiff's Depo. Tr. 321:1-10, **EXHIBIT 7**.)

17.     To date, Plaintiff has not submitted any documentation demonstrating her repair costs have exceeded the repair cost estimate prepared by McCoy.  Rather, Plaintiff continues to rely solely upon Deligorio's estimates.  (*See* Plaintiff's Amended Answer to CSAA's Interrogatory No. 7, **EXHIBIT 8**.)

18.     Plaintiff used a portion of the insurance benefits tendered to her to cover her day-to-day living expenses. (*See* Plaintiff's Depo. Tr. 74:1-7, **EXHIBIT 7**.)

19.     Shortly before her second deposition in this lawsuit, Plaintiff finally completed the repairs to the property. (*See* Plaintiff's Depo. Tr. 321:11-24, **EXHIBIT 7**.) And, after CSAA, through its attorney, was afforded an opportunity to inspect the property (*See* Plaintiff's Depo. Tr. 321:11-24, **EXHIBIT 7**), CSAA tendered Plaintiff the depreciation hold back of $8,697.21. (*See* CSAA Draft No. 0715559915, **EXHIBIT 9**.)

20.     In addition to the $47,622.36 (less depreciation) tendered to Plaintiff under Coverage A, CSAA has paid Plaintiff $2,499.00 to replace a riding lawn mower that she claimed was damaged by the vandals.  (*See* Correspondence to Bufogle from Weir (w/attachments), **EXHIBIT 10**.)

21.     Plaintiff has testified that she did not actually own the lawn mower and that it was damaged prior to the alleged vandalism.  (*See* Plaintiff's Depo. Tr. 188:13-189:18, **EXHIBIT 7**.)

22.     CSAA has paid Plaintiff $13,200.00 (12 months X $1,100.00/month) under the Coverage D - Fair Rental Value. (*See* CSAA Draft No. 0714833894, **EXHIBIT 11**; Correspondence to Bufogle, dated October 29, 2015, and attached Drafts, **EXHIBIT 6**.)

23.     Finally, Plaintiff claims that CSAA owes her $20,088.40 for "Mold Repairs."  (*See* Plaintiff's Amended Response to CSAA's Interrogatory No. 7, **EXHIBIT 8**; Deligorio's Report, **EXHIBIT 12**.)  However, Plaintiff has testified that she does not attribute the alleged mold damage to the purported vandalism.  Rather, the mold was caused by a leak in the roof that her prior tenants failed to tell her about.[1]  (*See* Plaintiff's Depo. Tr. 150:21-151:2, **EXHIBIT 7**.)

<u>**APPLICABLE STANDARD**</u>

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Koch v. Koch Indus. Inc.*, 203 F.3d 1202, 1212 (10th Cir. 2000). The party moving for summary judgment bears the initial burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 441 U.S. 317, 323 (1986).

---

[1]Therefore, the claimed mold damage is a separate loss that would be the subject of a separate claim.

Once the movant has met its burden, the adverse parties "**must set forward specific facts showing that there is a genuine issue for trial**." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (emphasis added). The court resolves all reasonable inferences in favor of the non-moving party. *Mattioda v. White*, 323 F.3d 1288, 1291 (10th Cir. 2003). If the non-moving party is the plaintiff, as in this case, she must present sufficient evidence to support a jury verdict. *Id.* at 1291. In other words, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The plaintiff "must set forth specific facts showing that there is a genuine issue of fact for trial." *First Nat'l Bank of Az. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

### ARGUMENTS AND AUTHORITIES

**PROPOSITION I:**   **PLAINTIFF HAS BEEN FULLY COMPENSATED FOR HER CLAIMED LOSS, AND THEREFORE, HER BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW.**

In order to maintain a claim for breach of contract, the plaintiff has the burden to establish: "(1) formation of a contract; (2) breach of the contract; and (3) damages as a direct result of the breach." *Digital Design Grp. Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 844 (Okla. 2001); *see also*, OKLAHOMA UNIFORM JURY INSTRUCTION 23.1 (requiring formation of a contract, breach of contract, and damages in order to recover on a claim for breach of contract). Thus, it is essential that a plaintiff demonstrate he/she has sustained damages as a result of the alleged breach. Assuming the plaintiff alleges facts sufficient to establish damages as a direct result of the breach, the plaintiff's recovery on the contract is limited to the amount that party would have received in case of full performance. Title 23 O.S. § 96, provides in full:

> Notwithstanding the provisions of this chapter, **no person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance**

> **thereof on both sides**, except in cases where recovery may be for exemplary damages and penal damages, and in Sections 2871 and 2878.

23 O.S. § 96 (emphasis added).

Under Oklahoma law, insurance policies are contracts and must be construed according to their terms. 36 O.S. § 3621; *Bituminous Cas. Corp. v. Cowen Const., Inc.*, 55 P.3d 1030, 1033 (Okla. 2002); *Lester v. Sparks*, 583 P.2d 1097, 1099 (Okla. 1978). "An insurer's liability to its insured is defined by the insurance contract." *Roads West, Inc. v. Austin*, 91 P.3d 81, 87 (Okla. Civ. App. 2003).

A.    *Plaintiff is not entitled to further benefits under Coverage A – Dwelling.*

To date, as a result of the claimed vandalism, CSAA has made payments to Plaintiff totaling $62,821.36. Under Coverage A – Dwelling, Plaintiff has received payments totaling $47,622.36 (less Plaintiff's $500.00 deductible). Plaintiff has received:  (a) an ACV payment in the amount $38,425.15 (UDF 15); and, (b) a payment for recoverable depreciation payment in the amount of $8,697.21 (UDF 19). These payments were made based upon the repair estimate prepared after inspecting the property and reviewing the information submitted by Plaintiff. (UDFs 13 & 14.) To date, Plaintiff has not presented a shred of admissible evidence demonstrating that she is entitled to additional benefits under Coverage A – Dwelling. Rather, Plaintiff relies entirely on her contractor Ismael Deligorio's replacement cost **estimates**.[2]  (UDF 17; *see also* Correspondence from Bufogal, dated October 6, 2015, **EXHIBIT 13**.)

---

[2]CSAA contends that Deligorio is not qualified to provide the necessary causation testimony linking the claimed damage to alleged vandalism. CSAA further contends that Deligorio's opinions do not meet the standard of reliability required by *Daubert*. (*See generally*, CSAA's *Daubert* Motion [Dkt. No. 31].) Therefore, CSAA submits that these estimates cannot be used as evidence refuting its motion for summary judgment.  *See* Rule 56, FED. R. CIV. P. (stating "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence")

It is well recognized that an important term in any replacement cost insurance policy is that an insurer's payment of ACV is triggered at the time of loss and RCV is triggered **only after the property is repaired or replaced**. *Colo. Cas. Ins. Co. v. Sammons*, 157 P.3d 460, 463 n.3 (Wy. 2007).  The primary reason for this two-step process "is that the amount of the insurer's liability cannot be determined until repair or replacement has occurred." *Id.* "It is the act of replacing the property that causes the insured to suffer an additional loss for which [it] purchased additional coverage." *Fitzhugh 25 Partners, L.P. v. Kiln Syn. KLN* 501, 261 S.W.3d 861, 864 (Tex. App. 2008).

In a relatively recent order, the United States District Court for the Western District of Texas explained the purpose of the two step recovery processes, as follows:

> This language is clear and unambiguous, and courts have routinely enforced replacement cost coverage provisions. *See Ghoman v. New Hampshire Ins. Co.*, 159 F.Supp.2d 928, 932 (N.D.Tex.2001); *Kolls v. Aetna Cas. & Sur. Co.*, 378 F.Supp. 392, 403 (S.D.Iowa 1974), aff'd, 503 F.2d 569 (8th Cir.1974); *D & S Realty, Inc. v. Markel Ins. Co.*, 284 Neb. 1, 816 N.W.2d 1, 14–15 (Neb.2012).  In *Ghoman*, the court, in describing contract language identical to the language above, noted "[i]t allows the insured to either make a claim for replacement costs, up to policy limits, or actual cash value supplemented by additional replacement cost coverage." 159 F.Supp.2d at 932.  "The purpose of this two-step process is to enable the insured to obtain funds 'to begin the process of repair or replacement, at which point [the insured] could submit claims for expenditures that went above the actual cash value of the loss.'"  *Id.* at 933 (quoting *Fraley v. Allstate Ins. Co.*, 81 Cal.App.4th 1282, 97 Cal.Rptr.2d 386, 390 (Cal.Ct.App.2000)).  **In other words, "if the insured has contracted for replacement cost coverage, the insured will normally be entitled under the policy to an immediate payment representing the actual cash value of the loss, <u>which can be used as seed money to start the repairs</u>."** *D & S Realty*, 816 N.W.2d at 15–16.

*Cent. Mut. Ins. Co. v. White Stone Prop., Ltd.*, A-12-CA-275-SS, 2014 WL 1092121, at *6 (W.D. Tex, Austin Div. March 19, 2014) (emphasis added).

10

Another reason for the two-step process for paying RCV is the long-standing public policy of protecting both the insured and the insurer alike from what the law terms the "moral hazard"— the ability of an insured to profit from insurance coverage rather than be compensated for actual loss. In *Higgins v. Ins. Co. of N. Am*, 469 P.2d 766 (Or. 1970), the Oregon Supreme Court aptly explained the two-step RCV process as well as the underlying public policy stating:

> [R]eplacement cost insurance, pays for full replacement cost [] of the insured property, **without deduction for depreciation....*The basic limitation is that the insured collects on this 'new for old' basis only if the property is repaired or replaced*** . . . liability under the policy accrues on an actual cash value basis **until repair or replacement has actually been effected.** This means that if the property is not repaired or replaced, the only liability of the company will be on an actual cash value basis . . . **The purpose of repair or replacement as a condition precedent to recovery under replacement cost insurance is *protection against the moral hazard.***

*Id.* at 772-73 (internal citations omitted, emphasis added). In *Truesdell v. State Farm Fire and Casualty Company*, 960 F.Supp. 1511, 1517 (N.D. Okla. 1997), the court concluded that the insurer's payment of replacement cost without the insured actually replacing or repairing the damaged property "would disregard the risk limiting nature of insurance contracts." *See also, Nicolaou v. Vermont Mut. Ins. Co.*, 931 A.2d 1265, 1271 (N.H. 2007)("Allowing a policyholder to recover replacement costs without actually repairing or rebuilding would leave him in a better position as a result of the fire than the position he was in before the fire, which is the "moral hazard" that the repair or replacement requirement is intended to avoid."); *Fitzhugh*, 261 S.W.3d at 864 ("To allow an insured to recover replacement costs in the absence of actual replacement would permit the insured to recover for a loss he has not suffered."); *Gilbert v. N. Carolina Farm Bureau Mut. Ins. Cos.*, 574 S.E.2d 115, 118 (N.C. App. 2002) ("The reason insurers place this [replacement cost] provision in insurance policies is to prevent an insured from making a profit from a loss."); *Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co.*, 756 N.W.2d 461, 474-75 (Wis. App. 2008) (finding that

payment of replacement costs without ensuring that the insured used the money to repair or replace the lost property would encourage insureds to "take the money and run" and would be commercially unreasonable).

The above-quoted courts have also concluded that the recovery under a replacement cost coverage policy is limited to the amount actually and necessarily incurred in the repair/replacement of the claimed damage. In *Knolls v. Aetna Cas. & Sur. Co*, 378 F.Supp.392 (S.D. Iowa 1974), the United States District Court for the Southern District of Iowa explained that:

> The amount recoverable under part (c) is the amount actually and necessarily expended in repairing or replacing said property on the same premises and intended for the same occupancy and use. Under this clause of the policy the plaintiffs would be entitled to a lesser amount than what they were actually paid, the sum of $631,955.00. It appears that the plaintiffs only spent $510,759.88 on repairing and replacing the property and it appears that a portion of this may not be allowable under part (c). Therefore, the maximum that the plaintiffs could recover if they were to insist on a recovery under the provisions of the Replacement Cost Endorsement would be a total of $510,759.88. Of course, the plaintiffs would not wish to recover under this provision of the policy when under the basic policy they recovered a sum of $631,955.00 which is a greater amount. Therefore, the Replacement Cost Endorsement is not of value to the plaintiffs until they have expended an amount greater than what they could recover under the basic policy coverage which was the $631,955.00.
>
> *                *                *
>
> It is clear in this case that the plaintiffs have not spent an amount in excess of the [ACV payment]. Therefore, they are not entitled to any recovery under the Replacement Cost Endorsement of this policy.

*Id.* at 400.

The United States District Court for the Western District of Texas recently came to a similar conclusion in *Cent. Mut. Ins. Co., supra,* stating:

> Since the actual cash value payment of $1,238,863.85 [Insurer] already paid [Insured] is greater than this replacement cost coverage

12

> [*i.e.* the amount actually incurred in repairing the insured property], [Insurer] does not owe [Insurer] any further amount.

*Id.* at \*9.

Likewise, in *Higgins, supra*, the Supreme Court of Oregon stated:

> The reasons for limiting recovery to the amount actually expended for repair or replacement seem reasonable, and such a limitation should be enforced if it is clearly stated in the insurance contract. We think that the language employed in the policy under consideration is sufficiently clear, and that the intent to limit the company's liability to amount actually expended is apparent from a careful reading of the replacement cost provisions. We conclude that since plaintiffs have not expended anything in repairing or replacing the insured building they are not eligible to recover under the 'Replacement Cost' extension of the policy.

469 P.2d at 167.

Not surprisingly, the loss settlement provision of the Policy provides in pertinent part:

> **2.** Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
>
> **a**. If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:
>
> > **(1)** The limit of liability under this policy that applies to the building;
> >
> > **(2)** The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or
> >
> > **(3)** The necessary amount actually spent to repair or replace the damaged building.
>
> If the building is rebuilt at a new premises, the cost described in (2) above is limited to the cost which would have been incurred if the building had been built at the original premises.
>
> \*          \*          \*

13

> **d**. We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in 2.a. and b. above.

(Certified CSAA Policy, DP3-002795271, pp. 31-32, **EXHIBIT 1**.)

Under this clear and unambiguous Policy provision, the repair **estimates** prepared by Plaintiff's contractors do not establish the value of Plaintiff's claim. Plaintiff is entitled to recover only the amount reasonably and necessarily incurred in the repair and replacement of the damaged property. Plaintiff has not submitted any documentation demonstrating she has spent in excess of the $47,622.36 to repair the claimed damage. And, Plaintiff admits that she did not provide any documentation to CSAA demonstrating that the repairs have been completed, because she finally completed the repairs during the pendency of this lawsuit. (UDF 19.) Plaintiff also admits that she used a portion of the insurance benefits provided to her to cover her day-to-day living expenses. (UDF 18.) Therefore, Plaintiff's breach of contract claim fails as a matter of law. Indeed, if the Court were to determine otherwise, the Court would in effect be re-writing the policy's terms. Under Oklahoma law, this is not something the Court has the liberty to do. *See Spears v. Shelter Mut. Ins. Co.* 73 P.3d 865, 868 (Okla. 2003).

B.      *Plaintiff is not entitled to further benefits under Coverage C - Personal Property.*

In addition to the above payments, CSAA also made a payment to Plaintiff in the amount of $2499.00 under Coverage C - Personal Property to replace a riding lawn mower that was purportedly damaged by the vandalism. (UDF 20.) However, Plaintiff has now admitted that she did not own the lawn mower and that it was damaged prior to the alleged vandalism. (UDF 21.) Said differently,

Plaintiff has tacitly admitted that she was not entitled to the benefits tendered to her for the replacement of the riding lawn mower.[3]

C.     *Plaintiff is not entitled to further benefits under Coverage D - Fair Rental Value.*

Throughout this lawsuit, Plaintiff has also claimed that she is entitled to additional benefits for the loss of rent, under Coverage D – Fair Rental Value.  To date, CSAA has tendered $13,200.00 (12 months at $1,100/month) in Fair Rental Value benefits to Plaintiff.  (UDF 22).  However, according to Plaintiff, she is entitled to recover in excess of $20,350.00 in Fair Rental Value benefits.  (*See* Plaintiff's Amended Answer to CSAA's Interrogatory No. 7, **EXHIBIT 8**.)  In support of this calculation, Plaintiff claims that she is entitled to the Fair Rental Value from the date of the alleged vandalism forward.

The policy provides in pertinent part:

> **D. Coverage D - Fair Rental Value**
>
> 1. If a loss to property described in Coverage **A, B** or **C** by a Peril Insured Against under this policy makes that part of the "Described Location" rented to others or held for rental by you unfit for its normal use, we cover the fair rental value of that part of the "Described Location" rented to others or held for rental by you less any expenses that do not continue while that part of the "Described Location" rented or held for rental is not fit to live in. Payment will be for the shortest time required to repair or replace that part of the "Described Location" rented or held for rental.
>
> 2. If a civil authority prohibits you from use of the "Described Location" as a result of direct damage to a neighboring location by a Peril Insured Against in this policy, we cover the Fair Rental Value loss for no more than two weeks.
>
> 3. The periods of time referenced above are not limited by the expiration of this policy.

---

[3]Upon receipt of this information, CSAA could have moved for leave to assert the affirmative defense of fraud and sought return of the benefits paid to Plaintiff.  As of now, CSAA has not made such request of the Court.

4. We do not cover loss or expense due to cancellation of a lease or agreement.

(Certified CSAA Policy, DP3-002795271, p. 11, **EXHIBIT 1**.)

With this above provision in mind, Plaintiff evicted her last tenant on or about August 11, 2014, or approximately three (3) months before the purported vandalism.  (*See* Pertinent portion of the "Documentation" submitted in support of Plaintiff's claimed Loss Rent, **EXHIBIT 14**.)  Further, at the time of the loss, the insured property was unfit for its normal use because, according to Plaintiff, the property was "in the process of reconstruction at the time due to [a] previous [un-related] loss." (Plaintiff's Petition [Dkt. No. 2-23, ¶ 6.) Therefore, because the property was, as Plaintiff admits, unfit for its normal use at the time of loss, Plaintiff has not and cannot meet her burden to show the loss at issue in this lawsuit actually triggered Coverage D – Fair Rental Value. Yet, acting in the utmost good faith, CSAA made the business decision to afford Plaintiff a full year's worth of rental income.  (UDF 22.)

Further still, the policy clearly states that "[p]ayment will be for the shortest time required to repair or replace that part of the 'Described Location' rented or held for rental." (Certified CSAA Policy, DP3-002795271, p. 11, **EXHIBIT 1**.)  But, Plaintiff delayed the repairs and used a portion of the insurance benefits she received to pay living expenses. (UDFs 17-19).  Therefore, the $13,200.00 gratuitously paid to Plaintiff for Fair Rental Value more than compensated Plaintiff for the "shortest time required to repair or replace" the covered damage. The hold otherwise would be tantamount to rewarding Plaintiff for her decision to delay repairs and misuse the insurance benefits tendered to her.

D.    *Plaintiff cannot recover for the claimed mold damage in this lawsuit.*

Plaintiff has also asserted that CSAA breached its contract with her by refusing to pay $20,088.40 for "Mold Repairs."  (UDF 23).  However, Plaintiff has testified that she does not

attribute the alleged mold damage to the purported vandalism.  Rather, the mold was caused by a leak in the roof that her prior tenants failed to tell her about.  (*See* Plaintiff's Depo. Tr. 150:21-151:2, **EXHIBIT 7**.)  Therefore, based upon Plaintiff's own testimony, the claimed mold damage would be a separate loss subject to a separate claim and cannot serve as an element of damages in this lawsuit.

E.      *Plaintiff is not entitled to recover attorney's fees as contractual damages.*

Finally, Plaintiff's pre-suit demands suggests that she believes she is entitled to recover attorney's fees as an element of her contractual damages.  Prior to filing suit, Plaintiff made the decision to retain an attorney to assist her with the presentation of her claim. Plaintiff then demanded that CSAA pay her attorney's fees because "every cent of the amounts intended for payment are needed for the property restoration."  (*See* Correspondence from Bufogle, dated June 12, 2015, **EXHIBIT 4**.)  However, nothing prevented Plaintiff from presenting additional information to CSAA or requesting CSAA reconsider its position without the assistance of an attorney. And, because the policy does not provide for the payment of attorney fees incurred during the presentation of a property damage claim, (*See generally* Certified CSAA Policy, DP3-002795271, **EXHIBIT 1**), CSAA was under no obligation to honor Plaintiff's demand for "reasonable attorney fees." *See Roads West Inc.*, 91 P.3d at 87.

In short, the undisputed material facts and above-cited authority clearly establish that Plaintiff has been fully compensated, if not over compensated, for her claimed loss.  The fact that Plaintiff spent the insured benefits on matters unrelated to the subject property does not entitle her to additional benefits.  Therefore, summary judgment should be entered in CSAA's favor with respect to Plaintiff's breach of contract claim.

### PROPOSITION II:   PLAINTIFF'S   BAD   FAITH   CLAIM   FAILS   AS A MATTER OF LAW.

Oklahoma adopted the tort of bad faith in first-party insurance cases in *Christian v. American Home Assur. Co.*, 577 P.2d 899 (Okla. 1977). In adopting this new type of tort, the Oklahoma Supreme Court realized that an insurer must still be given the discretion to disagree with its insured without automatically suffering the adverse consequences of potential "bad-faith" liability. As the Court reasoned:

> We do not hold that an insurer who resists and litigates a claim made by its insured does so at its peril that if it loses the suit or suffers a judgment against it for a larger amount than it had offered in payment, it will be held to have breached its duty to act fairly and in good faith and thus be liable in tort.

> We recognize that there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions.   **Resort to a judicial forum is not *per se* bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit.   Rather, tort liability may be imposed only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured.**

*Id.* at 904-05 (emphasis added).

In order to prevail on her bad faith claim, Plaintiff must establish by the greater weight of the evidence:

> 1. CSAA was required under the insurance policy to pay Plaintiff's claim;

> 2. CSAA refusal to pay the claim in full was unreasonable under the circumstances, because 1) it did not perform a proper investigation, 2) it did not evaluate the results of the investigation properly, 3) it had no reasonable basis for the refusal, or 4) the amount it offered to satisfy the claim was unreasonably low;

> 3. CSAA did not deal fairly and in good faith with Plaintiff; and

> 4. The violation by CSAA of its duty of good faith and fair dealing
> was the direct cause of the injury sustained by Plaintiff.

OUJI – 22.2 Bad Faith - First Party Insurance - Failure to Pay Claim of Insured.

Plaintiff's Petition asserts conclusory allegations of bad faith against CSAA. However, "the mere allegation that an insurer breached its duty of good faith and fair dealing does not automatically entitle the issue to be submitted to a jury for determination. *Randall v. Gov't Emp. Ins. Co.*, CIV-09-166-M, 2010 WL 845937, at *2 (W.D. Okla. 2010) (citing *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993)).  "In order to establish a bad faith claim, an insured 'must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim.'" *Id.* at *2 (quoting *Oulds*, 6 F.3d at 1436). Therefore, if the District Court finds the insurer's conduct was reasonable, the claim of bad faith should not be submitted to the jury. *Garnett v. Government Employees Ins. Co.*, 186 P.3d 935, 944 (Okla. 2008) ("Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law . . . whether the insurer's conduct may be reasonably perceived as tortious."); *see also City Nat. Bank & Trust Co. v. Jackson Nat. Life Ins.*, 804 P.2d 463 (Okla. Civ. App. 1990).

Furthermore, a bad faith cause of action "will not lie where there is a legitimate dispute." *Manis v Hartford Fire Ins. Co.,* 681 P.2d 760, 762 (Okla. 1984). Oklahoma courts have repeatedly held that a difference in opinion between the insurer and the insured in the (1) evaluation of a claim; (2) cause of loss or (3) amount of the loss does not constitute bad faith. *Id.* at 761 (citing *McCorkle v. Great Atlantic Ins. Co.,* 637 P.2d 583, 587 (Okla. 1981)); *Christian*, 577 P.2d at 904-05. "It is not a breach of the duty of good faith for an insurer to resort to a judicial forum to settle legitimate disputes as to the validity or amount of an insurance claim." *Garnett*, 186 P.3d at 944.

The Oklahoma Supreme Court addressed the defense of a "legitimate dispute" in *Garnett*. In that case, Garnett was a passenger in Hargrove's pickup truck. While stopped at a traffic light, Fain rear-ended Hargrove's pickup truck. Subsequently, Garnett retained counsel and submitted a UIM claim to GEICO for medical expenses, lost wages, pain and suffering, and mental anguish. *Id.* The UIM examiner later evaluated the total claim to be worth $11,000 to $13,000. After subtracting the liability policy limit of $10,000, the UIM examiner determined the UIM claim had a value of $1,000 to $3000. GEICO offered $1,000 to settle Garnett's UIM claim. Eventually, GEICO offered $3,000, the full amount it evaluated Garnett's UIM claim to be worth, to settle the claim. *Id.* at 939.

Garnett declared the $3,000 as the "undisputed amount" and demanded payment without settlement of the claim. GEICO refused this demand. Subsequently, Garnett filed a lawsuit alleging GEICO breached its contract with him and acted in bad faith by failing to provide a fair evaluation. GEICO moved for summary judgment on the bad faith claim, which was granted. Garnett appealed this decision.

The Oklahoma Supreme Court affirmed the summary judgment in GEICO's favor stating:

> Here, the passenger established that he had sustained $7226.66 in damages for medical expenses and lost wages. He also alleged that he sustained damages for pain and suffering and mental anguish. The insurer valued his UIM claim somewhere between $1,000 and $3,000. The passenger argued that the claim should have been valued somewhere between $13,000 and $15,000. Ultimately, the jury awarded the passenger $5,000, a number greater than the insurer's estimate, but closer to the insurer's range than to the passenger's. Clearly, the UIM claim was legitimately disputed, as evidenced by the jury's award. **Because a legitimate dispute existed between the parties as to the value of the UIM claim, the trial court did not err by granting summary judgment to the insurer . . .**

*Id.* 186 P.3d at 944 (emphasis added).

In *Duensing v. State Farm Fire & Casualty Company,* 131 P.3d 127 (Okla Civ. App. 2006), the insureds brought an action against their homeowners' insurer for breach of contract and bad faith.

20

The insureds asserted their insurer acted in bad faith by refusing to pay for cracks and settling as a result of plumbing leaks under the foundation of their home. *Id.* at 130. A jury found the insurer liable for both breach of a homeowners' insurance policy containing exclusions and bad faith in handling the claim. *Id.* at 132.

The Oklahoma Court of Appeals held the trial court erred in denying the insurer's motion for a directed verdict on the bad faith claim. In reaching that decision, it noted the insurer's denial of the claim was based on its interpretation of several exclusions in the policy. Although those exclusions were ultimately found to be inapplicable, the insurer's reliance on the exclusions was not unreasonable and did not constitute bad faith as a matter of law. *Id.* at 138.

Here, the undisputed facts demonstrate that CSAA, at all times, acted in the utmost good faith toward its insured. Plaintiff notified CSAA of the claimed loss on December 22, 2014. (UDF 4). CSAA immediately opened a file, assigned adjusters to Plaintiff's file and began its investigation. Within the a week of receiving notice of Plaintiff's claim, the field adjuster, Jimmy McCoy, made contact with Plaintiff and scheduled a site inspection to take place on January 5, 2015.[4] (UDFs 5 & 6). The site inspection was rescheduled, at Plaintiff's request, on multiple occasions. (UDF 6). Finally, on January15, 2015, Mr. McCoy was allowed to inspect the property. (UDF 7).

After reviewing the information obtained during McCoy's inspection and the information obtained during the investigation of Plaintiff's prior claim, CSAA concluded that the vacancy provision was applicable, unless Plaintiff could show otherwise. (UDF 8). Plaintiff was notified of CSAA's coverage position both verbally and in writing. (UDF 9). Plaintiff was also informed

---

[4]Mr. McCoy was assigned as the field adjuster, because he had assisted Plaintiff with her prior claims. Therefore, he was familiar with the property. Plaintiff was notified that Mr. McCoy was out on PTO but would contact him upon his return. (*See* Claim Note, December 22, 2014, at 10:44 A.M., **EXHIBIT 2**.)

that if she believed any of the information CSAA relied upon was inaccurate or if she had additional information that CSAA should consider, she should notify CSAA.  (UDF 10).

Subsequently, Plaintiff submitted information that she believed demonstrated the property was in the "process of reconstruction at the time [of the loss] due to the previous loss, and that . . . premises was not vacant but [was] being reasonably occupied for repairs," (Petition [Dkt. No. 2-2], ¶ 6), and requested CSAA reconsider its coverage position.  Specifically, Plaintiff provided documentation demonstrating that she had paid the utility bills for the months preceding the claimed loss.  (UDF 11).  At Plaintiff's request, CSAA reopened the file and ultimately paid Plaintiff $62,821.36 (less Plaintiff's $500.00 deductible) in benefits under the insurance contract.  (UDFs 15, 19, 20, 22).  And, as discussed above, it has become patently clear that Plaintiff was not entitled to many of the benefits tendered to her.  Simply stated, the undisputed facts of this case demonstrate that no reasonable mind, even when the evidence is viewed in the light most favorable to Plaintiff, could conclude that CSAA acted in bad faith toward Plaintiff. *See Duensing*, 131 P.3d at 137-39. Thus, summary judgment should be entered in favor of CSAA on Plaintiff's bad faith claim.

### PROPOSITION III: CSAA'S ALLEGED MISCONDUCT DOES NOT WARRANT SUBMISSION OF PLAINTIFF'S REQUEST FOR PUNITIVE DAMAGES TO THE JURY.

If partial summary judgment is entered in favor of CSAA on Plaintiff's bad faith claim, Plaintiff's claim for punitive damages must also fail as a matter of law.  *Peters v. American Life Ins. Co.*, 77 P.3d 1090 (Okla. Civ. App. 2003)(entry of judgment in favor of insurer on bad faith claim also disposes of punitive damage claim).

However, even in the event this Court permits Plaintiff to pursue a bad faith claim, Plaintiff's request to submit a punitive damages claim to the jury should be denied.  A plaintiff ***will not*** be routinely entitled to punitive damages even if bad faith has been found to exist.  Specifically:

In the case of *Timmons v. Royal Globe Ins. Co.*, 1982 OK 97, 653 P.2d 907, this Court acknowledged the applicability of the standard relating to punitive damages . . .

> Exemplary damages are imposed by the law on the theory of punishment to the offender, for the general benefit of society, and are allowed only in cases where fraud, oppression, gross negligence or malice, actual or presumed, enter into the cause of action, but a person may commit such wilful acts in reckless disregard of another's rights that malice will be inferred. *Timmons* involved a claim of bad faith dealing by an insurance company. Our recognition of the standard stated in *Oden v. Russell* as applicable in *Timmons* may only be read to indicate that the question of proof necessary to sustain a claim for punitive damages in a bad faith case involving an insurance company is the same standard necessary to sustain such a claim in any case where punitive damages are sought under 23 O.S. 1981 § 9.

In the case of *Slocum v. Phillips Petroleum Co.*, this Court stated:

> To entitle a plaintiff to recover exemplary damages in an action sounding in tort, the proof must show some elements of fraud, malice or oppression. The act which constitutes the cause of action must be actuated by or accompanied with some evil intent, or must be the result of such gross negligence-such disregard of another's rights-as is deemed equivalent to such intent. *Dilworth v. Fortier*, 405 P.2d 38 (Okl.1964) and *Edwards v. Lachman*, 534 P.2d 670 (Okl.1974). Exemplary damages are allowed only in cases where fraud, oppression, gross negligence or malice, actual or presumed, enter into the cause of action, but a person may commit such willful acts in reckless disregard of another's rights that malice may be inferred. *Oden v. Russell*, 207 Okl. 570, 251 P.2d 184 (1952).

*McLaughlin v. National Benefit Life Ins. Co.,* 772 P.2d 383, 387 (Okla. 1988).

Thus, Plaintiff must show CSAA acted with oppression, malice, fraud, gross negligence or wantonness. *Id.* "Even where there is evidence to support recovery of actual damages in a bad faith action against an insurer, submission of the issue of punitive damages to a jury may be improper." *Willis v. Midland Risk Insurance Co.*, 42 F.3d 607 (10th Cir. 1992). Punitive damages do not follow

from every breach of the duty of good faith, or in every case in which a jury may render a verdict for

the wronged party.  *Id*.

> A plaintiff can succeed in establishing bad faith on the part of an insurer that is sufficient to support an award of actual damages, but insufficient to support submission of the issue of punitive damages. The "bad faith" must be accompanied by some "aggravating circumstance" to warrant submission of punitive damages to the jury under *McLaughlin*, while clear and convincing evidence of the requisite "evil intent" is required to submit the issue of punitive damages that exceed the actual damages under 23 O.S. 1991 § 9.

*Cooper v. National Union Fire Ins. Co. of Pittsburgh, PA,* 921 P.2d 1297 (Okla. Civ. App. 1996)

(citation omitted).

Even though bad faith is something more than unreasonable conduct, it is not necessarily

conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud, or

malice, such that punitive damages would be warranted.  The bad faith must be accompanied by

some aggravating circumstance to warrant submission of punitive damages to the jury. Even if

reckless disregard can be plainly shown, this is not the same thing as it being demonstrated by clear

and convincing evidence as required under the punitive damages statute. *Id.*; *see also Hall v. Globe*

*Life & Acc. Ins. Co.,* 968 P.2d 1263, 1266 (Okla. 1998) (a punitive damage award "is not automatic,

but rather is governed by the standard applicable in other tort cases.").

Here, Plaintiff cannot present clear and convincing evidence of acts which were intentionally

wrongful such as the deception and dishonesty necessary to assert a punitive damage claim. In the

absence of a showing of "oppression, fraud or malice, actual or presumed," 23 O.S. § 9(A), it would

be improper to submit the issue of punitive damages to the jury.

### CONCLUSION

For the foregoing reasons, Defendant, CSAA Fire & Casualty Insurance Company, respectfully requests the Court enter summary judgment in its favor.

Respectfully Submitted,


s/ Erin J. Rooney
Gerard F. Pignato, OBA No. 11473
Erin J. Rooney, OBA No. 31207
PIGNATO, COOPER, KOLKER & ROBERSON, P.C.
Robinson Renaissance Building
119 North Robinson Avenue, 11th Floor
Oklahoma City, Oklahoma 73102
Telephone:    405-606-3333
Facsimile:      405-606-3334
Email:  Jerry@pclaw.org
          erin@pclaw.org
**ATTORNEYS FOR DEFENDANT, CSAA
FIRE & CASUALTY INSURANCE COMPANY**


### CERTIFICATE OF SERVICE

This is to certify that on the _____ day of April 2017, a true and correct copy of the above and foregoing instrument was forwarded to:

Karen Sue Sperling                         *VIA EMAIL AND VIA U. S. MAIL*
Post Office Box 414
Sapulpa, Oklahoma 74067
Email: suzzieque52@gmail.com
PLAINTIFF, PRO SE


s/ Erin J. Rooney
For the Firm